# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

SUE TAYLOR,
o/b/o D.T., a minor,[1]

    *Plaintiff*,

v.                                                CASE NO. 12-CV-14435

COMMISSIONER OF                DISTRICT JUDGE PAUL D. BORMAN
SOCIAL SECURITY,                MAGISTRATE JUDGE CHARLES E. BINDER

    *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[2]

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff's minor child, D.T., is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

---

[1] The Complaint refers to the minor plaintiff by her full name, and therefore so does the Court's docket. However, the minor should have been referred to as "D.T.," since Rule 5.2(a)(3) of the Federal Rules of Civil Procedure prohibits the use of a minor's name and requires that only a minor's initials be used.

[2] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

## II. REPORT

### A. Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for supplemental security income ("SSI") benefits for Plaintiff's minor child. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 13.)

Plaintiff's daughter, D.T., was nine years of age at the time of the most recent administrative hearing. (Transcript, Doc. 7 at 39, 81.) Plaintiff filed the instant claim on April 8, 2010, alleging that D.T.'s disability began on August 1, 2005. (Tr. at 81.) The claim was denied at the initial administrative stages. (Tr. at 68.) In denying the claims, the Defendant Commissioner considered autism or other pervasive developmental disorders as a possible basis of disability. (*Id.*) On June 16, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") Jessica Inouye, who considered the application for benefits *de novo*. (Tr. at 20-38, 39-63.) In a decision dated June 23, 2011, the ALJ found that D.T. was not disabled. (Tr. at 35.) Plaintiff requested a review of this decision on July 5, 2011. (Tr. at 18-19.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on August 23, 2012, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-4.) On October 6, 2012, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B. Standard of Review

In enacting the social security system, Congress created a two-tiered system in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531

("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, the court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of the court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record,

regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

**C.     Governing Law**

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II, 42 U.S.C. § 401 *et seq.*, and the Supplemental Security Income Program ("SSI") of Title XVI, 42 U.S.C. § 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

A child will be considered disabled if he or she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations . . . ." 42 U.S.C. §

5

1382c(a)(3)(C)(I). To determine whether a child's impairment results in marked and severe limitations, Social Security Administration ("SSA") regulations[3] prescribe a three-step sequential evaluation process:

1. If a child is doing substantial gainful activity, the child is not disabled and the claim will not be reviewed further.

2. If a child is not doing substantial gainful activity, the child's physical or mental impairments will be considered to see if an impairment or combination of impairments is severe. If the child's impairments are not severe, the child is not disabled and the claim will not be reviewed further.

3. If the child's impairments are severe, the child's impairment(s) will be reviewed to determine if they meet, medically equal or functionally equal the listings. If the child has such an impairment and it meets the duration requirement, the child will be considered disabled. If the child does not have such impairment(s), or if the duration requirement is not met, the child is not disabled.

20 C.F.R. § 416.924(a). In the third step – namely, whether a child's impairment functionally equals the listings – the Commissioner assesses the functional limitations caused by the child's impairment(s). 20 C.F.R. § 416.926a(a). The Social Security regulations list specific impairments relevant to step three, some of which apply only to children. *Id.* § 416.924(d). A claimant bears the burden of proving that his or her impairment satisfies, or "meets," one of the listed impairments. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir.1995); *see also Hall ex rel. Lee v. Apfel*, 122 F. Supp. 2d 959, 964 (N.D. Ill. 2000) (child's claim). Once a claimant makes such a showing, an irrebuttable presumption of disability arises and benefits must be awarded. *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)).

To "meet" a listed impairment, a child must demonstrate both "A" and "B" criteria. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. "A" criteria are medical findings and "B" criteria "describe

---

[3] For a history of these regulations, see *Molina v. Barnhart,* No. 00-CIV-9522(DC), 2002 WL 377529 (S.D.N.Y. March 11, 2002).

impairment-related functional limitations." *Id*. An impairment that shows some but not all of the criteria, no matter how severely, does not qualify. *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995); *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). If a child's impairments do not "meet" a listed impairment, they may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment. 20 C.F.R. § 416.926a(a). A child's impairments "equal" a listed impairment when the child demonstrates a "'marked' limitation[ ] in two domains of functioning or an 'extreme' limitation in one domain." *Id.*

Domain analysis is equivalent to analysis of the "A" and "B" criteria for listed impairments and focuses on "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The regulations include six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. *Id*. A "marked" limitation is one which "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(I). It "is 'more than moderate' but 'less than extreme.'" *Id.*

### D.     ALJ Findings

The ALJ applied the Commissioner's disability analysis described above and found at step one that D.T. was born on July 1, 2001, and therefore was a school-aged child on March 23, 2010, the date the application was filed, is currently a school-aged child, and that she had not engaged in substantial gainful activity since March 23, 2010, the application date. (Tr. at 26.) At step two, the ALJ found that D.T.'s attention deficit hyperactivity disorder, possible Asperger's syndrome, and mild speech impediment were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that D.T.'s combination of impairments met or equaled

one of the listings in the regulations. (Tr. at 26-34.) Therefore, the ALJ found that D.T. was not disabled. (Tr. at 34-35.)

**E.     Administrative Record**

In 2005, a multi-disciplinary team assessed D.T. as a child "with borderline average cognitive, motor, and language abilities." (Tr. at 171.) There were no impairments found; therefore, D.T. was not eligible for special education services. (Tr. at 172, 228-29.) However, D.T. was determined to be eligible for some school social work services. (Tr. at 220.) At the conclusion of preschool in 2007, it was noted that D.T. was "[p]rogressing on schedule." (Tr. at 194.)

In 2007, D.T. was evaluated and she did "not qualify for direct physical therapy services through the school system" "due to her high level of function in her gross motor skills." (Tr. at 223.) In 2007, Ms. Huston indicated that D.T.'s "receptive vocabulary skills fall within normal limits" but her "expressive vocabulary skills (ability to name pictures) is in the low average range," such that D.T. was "eligible to receive direct speech and language therapy to strengthen her expressive language skills." (Tr. at 166.)

At the request of Disability Determination Services ("DDS"), D.T. was examined by John A. Neher, Psy.D., on November 15, 2008. (Tr. at 232-36.) Dr. Neher summarized that D.T.

> performed within the Average range on a measure of intellectual functioning when compared to peers of similar age. Her mother reports appropriate social interactions with family, friends, and teachers. A teacher report provided indicated she often has difficulty following directions in the classroom. This seems consistent with her mother's report while the claimant is at home. She had exhibited speech problems but reports from her mother and teacher indicate she has dramatically improved the past year. Also, she does not seem to exhibit any unusual stereotyped or repetitive behaviors. However, she does seem to experience difficulty paying close attention to details, sustaining attention (i.e., her performance on working memory tasks), following directions, easily distracted, and staying seated.

(Tr. at 235-36.) Dr. Neher diagnosed Attention-Deficit/Hyperactivity Disorder, combined type, assessed a GAF score of 60 and gave a good prognosis, provided D.T. "obtains necessary treatment for behavioral issues and school work when needed." (Tr. at 236.)

On December 5, 2008, a Childhood Disability Evaluation Form was completed by Ron Marshall, Ph.D. (Tr. at 238-43.) Dr. Marshall concluded that D.T. has a less than marked limitation in acquiring and using information because of her "very low reading, math, and written language abilities" and "problems expressing ideas[,]" and because of her "[e]rrors in syntax, morphology, semantics" and difficulty in "explaining main ideas of her thoughts," but also noting that her full scale IQ was 90. (Tr. at 240.) Dr. Marshall also found less than marked limitation in attending and completing tasks based on D.T.'s "very poor focus and attention," noting that "[a]s long as she stays on task, she is a good student, but she does act out and distract others" and her "[p]rocessing speed [was] above average." (*Id.*) Dr. Marshall also found a less than marked limitation in interacting and relating with others based on D.T.'s "[s]light problem making and keeping friends" and the fact that she "[d]oes not look actively for friendship outside of her sister," but found that "[a]lmost all speech [was] understood," so "[n]o diff[iculty] w[ith] intelligibility." (*Id.*) Dr. Marshall found no limitation in moving about and manipulating objects, no limitations in health and physical well-being, and a less than marked limitation in caring for yourself based on the fact that D.T. is a "[v]ery emotional child who cries often" and "fake cries to draw attention and her feelings are hurt easily" and she "cannot take discipline or consequences very well," although she is "very clean and well taken care of." (Tr. at 241.)

On January 6, 2009, D.T. was referred for a psychoeducational evaluation with David Green, School Psychologist. (Tr. at 270-74.) Dr. Green noted that D.T. was "polite and cooperative" and was "very pleasant" and "provided a good effort across all subtest

9

administrations." (Tr. at 271.) Dr. Green stated that "[a]cademically, [D.T.] is experiencing some minor delays in the curriculum area of mathematics. Currently, the extent of these delays is not extensive enough to qualify her for special education support services as a learning disabled." (Tr. at 272.) Dr. Green noted that D.T.'s "math reasoning skills are not quite a grade level" and that in "the areas of reading and written language, more substantial delays have been identified" that "are extensive enough to allow [D.T.] use of the school's special education programs under a learning disability if the IEP [Individualized Education Program] team feels this is necessary." (Tr. at 272-73.) Dr. Green also found D.T. "to be somewhat active and distractible, even in these one-to-one testing situations." (Tr. at 273.) Dr. Green opined that D.T. "does demonstrate many of the characteristics of a learning disabled student" and "[m]ay be eligible to receive special education instructional support services as a learning disabled student in the areas of basic reading skills, reading comprehension, reading fluency and written expression." (*Id.*)

On January 6, 2009, D.T.'s IEP evaluation noted that D.T.'s "reading improved, more independence, more attentive to classroom needs." (Tr. at 288.)

On January 19, 2009, a School Social Work Report was completed by Judy Stapleton, MSW, LMSW. (Tr. at 265-66, 303.) Ms. Stapleton noted that D.T.'s score of 34 on the Autism Behavior Checklist ("ABC") was far below the ranges of 54-67 or 68 and higher such that it is "unlikely" that D.T. has autism. (Tr. at 265.) As to the Asperger's Syndrome Diagnostic Scale ("ASDS"), D.T.'s score of 94 "indicates a likely possibility for Asperger's Syndrome." (*Id.*) Under the ASDS scale, 90-100 indicates likeliness and scores above 110 indicate the probability is very likely. (*Id.*)

On January 24, 2009, a Speech and Language Questionnaire was completed by Leona Huston indicating that D.T.'s primary speech problem is expressive lazy delay but that D.T. has

10

"[n]o difficulty with intelligibility[,]" that she does not stutter or exhibit dysfluencies, and that her vocal quality and oral motor functioning and structures were all within normal limits. (Tr. at 163-64.)

On March 27, 2009, a Speech and Language Diagnostic Report was completed by Ms. Huston. (Tr. at 276-78.) Ms. Huston stated that "[c]urrent testing revealed [D.T.'s] receptive and expressive language skills to be essentially within normal limits." (Tr. at 277.) Ms. Huston noted that D.T. "has difficulty with attending to task and is highly distractible to outside stimuli such as background noise" and "visual stimuli that catch her attention." (*Id.*) Ms. Huston concluded that D.T. "is not eligible to receive direct services as speech and language impaired at this time. Other areas of eligibility should be explored for special services." (*Id.*)

On March 31, 2009, a Childhood Disability Evaluation Form was completed by Robert Newhouse, M.D. (Tr. at 316-21.) Dr. Newhouse found a less than marked limitation in acquiring and using information based on the Asperger's evaluation done in January 2009 and Plaintiff's teacher's forms. (Tr. at 318.) Dr. Newhouse also found a less than marked limitation in attending and completing tasks because of D.T.'s activities of daily living and information on her teacher's forms. (*Id.*) Dr. Newhouse found a less than marked limitation in interacting and relating with others because D.T.'s activities of daily living show she has age-appropriate friends and normal relationship with her siblings, and based on information contained in her teacher's forms. (*Id.*) Dr. Newhouse found no limitations in moving about and manipulating objects, no limitation in caring for yourself, and no limitation in health and physical well-being. (Tr. at 319.) Dr. Newhouse concluded that the "allegations are not consistent with ADL [activities of daily living], teacher form or MSE and suggest partial credibility." (Tr. at 321.)

11

D.T.'s second-grade teacher, Gary Hunkins, completed a Teacher Questionnaire on May 1, 2009. (Tr. at 95-102.) Mr. Hunkins observed an obvious problem in all areas of the acquiring-and-using-information domain except for comprehending oral instructions and applying problem-solving skills, where he observed a serious problem. (Tr. at 96.) In the domain of attending and completing tasks, Mr. Hunkins observed slight through serious problems on a daily basis. (Tr. at 97.) In the domain of interacting and relating with others, Mr. Hunkins noted slight to serious problems and commented that D.T. "sits in the back row on a corner and if she has a problem she will isolate herself from it[.]" (Tr. at 98.) Mr. Hunkins noted that he understands almost all of D.T.'s speech. (Tr. at 99.) In the domain of moving about and manipulating objects, Mr. Hunkins found obvious to serious problems. (Tr. at 99.) In the domain of caring for herself, Mr. Hunkins found slight through serious problems. (Tr. at 100.)

On May 6, 2010, Karen Bradley, a teacher consultant who serves as D.T.'s case manager, completed a Teacher Questionnaire. (Tr. at 113-20.) Ms. Bradley observed that in the domain of acquiring and using information, D.T. has a slight problem comprehending oral instructions, understanding school and content vocabulary, understanding and participating in class discussions, expressing ideas in written form, and learning new material, and has an obvious problem in providing organized oral explanations and adequate descriptions, in recalling and applying previously learned material, and in applying problem-solving skills in class discussions. (Tr. at 114.) Ms. Bradley commented that D.T. has "[s]omewhat of a problem describing a situation when their [sic] has been a conflict (putting events in order)[.]" (*Id.*) In the domain of attending and completing tasks, Ms. Bradley observed that D.T. has no problem sustaining attention during play/sports activities, has a slight problem with paying attention when spoken to directly, waiting to take turns, and changing from one activity to another without being disruptive, and an obvious

problem with focusing long enough to finish assigned an activity or task, refocusing to task when necessary, carrying out single-step instructions, carrying out multi-step instructions, organizing her own things or school materials, completing work accurately without careless mistakes, and working at a reasonable pace/finishing on time. (Tr. at 115.) She also found that D.T. has a serious problem with completing classroom or homework assignments and without distracting herself or others. (*Id.*) Ms. Bradley commented that D.T. "often needs to be redirected to complete assignments, follow along while reading in a group, etc." (*Id.*)

In the domain of interacting and relating to others, Ms. Bradley observed no problem expressing anger appropriately, asking permission appropriately, respecting/obeying adults in authority, a slight problem in following rules, using language appropriate to the situation and listener, introducing and maintaining relevant and appropriate topics of conversation, and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation. (Tr. at 116.) Ms. Bradley also observed an obvious problem in playing cooperatively with other children, making and keeping friends, seeking attention appropriately, relating experiences and telling stories, taking turns in conversation, and interpreting the meaning of facial expressions, body language, hints, sarcasm. (*Id.*) Ms. Bradley commented that D.T. "is less mature than some of her peers. I believe [D.T.] is often confused as she misunderstands how other children communicate to her." (*Id.*) Ms. Bradley indicated that she understands almost all of D.T.'s speech. (Tr. at 117.) Ms. Bradley concluded that D.T. has no problems with moving about and manipulating objects. (*Id.*) In the domain of selfcare, Ms. Bradley observed that D.T. has no problem taking care of personal hygiene or caring for physical needs (i.e., dressing, eating), has a slight problem on a weekly basis using good judgment regarding personal safety and dangerous circumstances and knowing when to ask for help, and has an obvious problem on a weekly basis

handling frustration appropriately, being patient when necessary, identifying and appropriately asserting emotional needs, responding appropriately to changes in her own mood, using appropriate coping skills to meet the daily demands of the school environment, and knowing when to ask for help. (Tr. at 118.) Ms. Bradley commented that D.T. "has some difficulties with peers. Her feelings are hurt easily. During those times she whines and cries usually to an adult and trying to tell her story." (*Id.*) It was also noted that D.T. does not have any physical issues. (Tr. at 119.)

An IEP evaluation dated March 10, 2011, indicated that D.T. "is still occasionally getting behind in her assignments, overall she keeps up with her peers academically." (Tr. at 330.)

D.T.'s fourth-grade teacher, Carrie Miller, completed a Childhood Disability Evaluation Form on June 1, 2011. (Tr. at 147-54.) Ms. Miller opined that D.T. has autistic impairment that functionally equals the Listing. (Tr. at 147.) Ms. Miller found a marked limitation in acquiring and using information because D.T. "at times needs to be reminded several times to complete something. She can be highly distracted by the activities around her. When needing to wait for assistance or [if] she doesn't understand something she will talk to herself or engage in a 'whiny' talk[.]" (Tr. at 149.) In the domain of attending and completing tasks, Ms. Miller found a marked limitation because "[i]t is no uncommon for [D.T.] to get behind in her assignments. Teachers have a weekly communication with the parent to help lessen the problem." (*Id.*) Ms. Miller found a marked limitation in interacting and relating with others because D.T. "does not maintain friends. She is somewhat a loaner [sic]. Her maturity level is different than most of her peers." (*Id.*) Ms. Miller found no limitation in moving about and manipulating objects and a less than marked limitation in caring for yourself, indicating that D.T. had difficulties eating and staying clean in the past but that she has done "much better in this area than she was in the past." (Tr. at 150.) Ms. Miller also found no limitations in health or physical well-being. (Tr. at 150-51.)

When considering functional equivalence, Ms. Miller found a marked limitation in acquiring and using information because it is "[d]ifficult for [D.T.] to acquire knowledge that is not right there in the text. It's very hard for her to use previously learned information due to lack of focus. She is capable but her inattentiveness creates problems." (Tr. at 155.) In the domain of attending and completing tasks, Ms. Miller found a marked limitation because D.T. "has to be redirected multiple times daily. She can attend and complete a task when directed, but doesn't always use care when doing so." (*Id.*) Ms. Miller found a less than marked limitation in the domain of interacting and relating with others because D.T. "can relate and interact with others. She has difficulty letting go of issues during a disagreement, but otherwise is very easy going." (*Id.*) Ms. Miller also found a marked limitation in moving about and manipulating objects because D.T.'s "writing, especially cursive, is very difficult for her. Her handwriting is very hard to read. She moves about as if she is floating on air. She often walks on her toes, skips, or shuffles to the side." (Tr. at 156.) As to the domains of caring for yourself and health and physical well-being, Ms. Miller found no limitations. (*Id.*)

At the administrative hearing, D.T. testified that she was in fourth grade and that she would be attending summer school. (Tr. at 45.) D.T. indicated that she likes softball and plays outfield. (Tr. at 46.) D.T. stated that she has a twin sister and a baby brother who is four and that she gets along with her brother "[k]ind of good." (Tr. at 47.) D.T. stated that she plays with him and reads "Baby Mouse" books to him and that she likes to jump on the trampoline with her sister. (*Id.*) D.T. stated that her mom has to yell at her to keep her room clean but that she enjoys feeding the dogs and her pet rabbit. (Tr. at 48.) D.T. testified that her fourth grade teacher was Miss Miller. (Tr. at 49, 52.) D.T. stated that she likes Miss Miller and all her teachers but that she does get in trouble a "little bit." (Tr. at 52.) D.T. stated that she was reading a chapter book on manners and that she

15

had read "tons" of the "Wimpy Kids" books at school and that she enjoys reading her collection of Barbie books at home. (Tr. at 53.) D.T. explained that her "bubble seat" helps her "work harder" because it is "fun to squish in" and that keeps her in her seat longer. (Tr. at 53-54.) D.T. added that she could stop using it "[i]f I could get my work done" and that she stopped using it this past year, i.e., in fourth grade. (Tr. at 54.)

D.T. indicated that she works hard but that she usually only finishes half her homework and forgets the rest. (Tr. at 50.) D.T. stated that her best friend moved to Hawaii but that she also has teammates who are friends. (Tr. at 51-52.) D.T. stated that she likes riding a bike and running around and that she is able to get dressed by herself, but that her mom helps wash and brush her hair. (Tr. at 54.)

When D.T.'s mother was asked by the ALJ whether there were any things that D.T. stated that she disagreed with, D.T.'s mother testified that she "remind[s] her a lot to clean up her room and make sure she gets her homework done." (Tr. at 55.) When asked whether her reminders were "knockdown, drag out" or ordinary, she responded that they were typical. (Tr. at 55-56.) As to sibling fighting, D.T.'s mother stated that "[i]t's more of her brother's kind of egging her on and she's kind of fighting back a little bit." (Tr. at 56.) She further testified that school for D.T. "went pretty good" this past year. (*Id.*) When asked what went well, she responded that D.T. was "concentrating a little bit more, kind of staying in her seat a little bit more." (*Id.*) D.T.'s mother indicated that the most difficult things this past year were "[g]etting her to get her work turned in and getting it done" because she thinks D.T. "don't want to bring it home. She just stuffs it in her desk or in her locker[.]" (*Id.*)

D.T.'s mother confirmed that D.T. is not in special education classes but does receive some services, i.e., one-on-one time with Mrs. Bradley or Mr. Sherman if D.T. needs "more redirecting

16

and giving them more directions." (Tr. at 57.) When asked whether D.T.'s issues are more related to learning the work or focusing, D.T.'s mother responded, "I think it's more of the focusing, but it's the other one too a little bit." (Tr. at 57-58.) D.T.'s mother also stated that D.T. does not have any difficulty getting along with adults and teachers and that "she's really friendly with everybody" to the point that it is a little scary because she'll "just walk up to somebody and start talking to them like [she's] known them forever." (Tr. at 58.)

In response to counsel's questioning, D.T.'s mother added that D.T. also received an hour of tutoring twice a week after school from February through May for help in math and reading. (Tr. at 60-61.) When asked whether she ever pursued the question of whether D.T. had Asperger's, D.T.'s mother responded, "They [D.T. and her twin sister] were supposed to be getting tested through Highland Pines," but that she did not have an appointment nor had she done much about it but that she "think[s] they do" have Asperger's because "they were the only kids that could not stand still." (Tr. at 61-62.) D.T.'s mother added that if teachers "put them by a book shelf, then they'll just grab a book and start reading a book instead of doing their work." (Tr. at 62-63.)

### F. Analysis and Conclusions

#### 1. Legal Standards

After review of the record, I suggest that the ALJ utilized the proper legal standard in her application of the Commissioner's child disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

#### 2. Substantial Evidence

Plaintiff contends that substantial evidence fails to support the findings of the Commissioner. (Doc. 9.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the

matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff specifically contends that the ALJ "erred as a matter of law by failing to properly evaluate all the medical records and opinions of evidence." (Doc. 9 at 6-10.)

"Functional equivalence is determined by 20 C.F.R. § 416.926a, which requires a 'marked' impairment in two 'domains' or an 'extreme' impairment in one domain." *Kelly v. Comm'r of Soc. Sec.,* 314 F. App'x 827, 829 (6th Cir. 2009) (quoting 20 C.F.R. § 416.926a(d)). An extreme limitation is defined as one that "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities" and that is "more than marked." 20 C.F.R. § 416.926a(e)(3).

Here, the ALJ concluded that D.T. had a less than marked limitation in acquiring and using information, a less than marked limitation in attending and completing tasks, a less than marked limitation in interacting and relating to others, no limitation in moving about and manipulating objects, no limitation in the ability to care for herself, and no limitation in health and physical well-being. (Tr. at 29-34.) I suggest that the ALJ's findings are supported by substantial evidence.

First, I note that D.T. did not attend special education classes. (Tr. at 57, 172, 223, 228-29.) In addition, only one of the teachers, Carrie Miller, found D.T. had a marked limitation in more than one domain. (Tr. at 147-56.) Second, the ALJ's findings are in accord with all of the opinions of the doctors who assessed D.T., i.e., Dr. Neher (Tr. at 235-36,) Dr. Marshall (Tr. at 238-43,) and Dr. Newhouse. (Tr. at 316-21.) In addition, the underlying test results support the ALJ's findings. In 2009, Ms. Huston stated that "[c]urrent testing revealed [D.T.'s] receptive and expressive language skills to be essentially within normal limits." (Tr. at 277.) In addition, on March 10,

18

2011, an IEP evaluation indicated that D.T. "is still occasionally getting behind in her assignments, overall she keeps up with her peers academically." (Tr. at 330.)

Finally, I suggest that there can be no error for the ALJ's reliance on the opinions of the doctors, despite the fact that they may have been contradicted by the opinions of D.T.'s teacher or case manager. (Doc. 9 at 8.) Teachers and case managers are not treating sources entitled to any deference, whereas psychologists are treating sources and therefore are entitled to deference. 20 C.F.R. § 404.913(d)(2); 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 404.1502; SSR 06-03p, 2006 WL 2329939, at *1-2 (2006); *Perry ex rel. G.D. v. Comm'r of Soc. Sec.*, 501 F. App'x 425, 427 (6th Cir. 2012) (the minor's "teachers are not acceptable medical sources").

### 3. Conclusion

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

### III. REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837;

*Frontier Ins. Co.,* 454 F.3d at 596-97.  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

                                                               s/ Charles E. Binder
Dated: September 4, 2013                                            CHARLES E. BINDER
                                                                     United States Magistrate Judge

**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  September 4, 2013                                        By      s/Patricia T. Morris
                                                             Law Clerk to Magistrate Judge Binder